822 So.2d 1201 (2001)
Betty GARDNER
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY et al.
2991183.
Court of Civil Appeals of Alabama.
April 20, 2001.
*1203 William Dudley Motlow, Jr., Don Hall, and W. Perry Webb of Porterfield, Harper & Mills, P.A., Birmingham, for appellant.
Jay St. Clair and Kelly H. Estes of Bradley, Arant, Rose & White, L.L.P., Birmingham, for appellees.
THOMPSON, Judge.
The plaintiff Betty Gardner appeals from a judgment as a matter of law ("JML") on her claims of breach of contract and fraudulent misrepresentation against the defendants State Farm Mutual Automobile Insurance Company and affiliated companies, and certain of its individual executives (collectively referred to herein as "State Farm"). We affirm the judgment of the trial court.
In 1986, after being employed for almost 20 years in various positions in State Farm's regional office, Gardner accepted a job as a State Farm insurance sales agent; she and State Farm executed an agreement setting forth the pertinent terms between the parties. The "Agent's Agreement" that Gardner executed was terminable at will by either party upon written notification. State Farm directed Gardner to operate a State Farm agency in Jemison. Her business grew steadily until 1996. Although her general business had grown, her losses on automobile policies were high, according to State Farm guidelines.
In 1996, State Farm implemented a "Management for Quality/High Priority Program,"[1] to address a problem that had come to its attention pertaining to excessive company losses under the automobile policies. Agents who met any one of three criteria were placed in the "High Priority Program." One of the criteria that identified agents for enrollment in the program was an indication that their sales of automobile policies had not been profitable over three of the last five years. A second criterion targeted agents whose cumulative total automobile policy losses to the company over the previous five years had exceeded $500,000. The final criterion *1204 identified agents who had not earned a minimum of 40 honor points out of a possible 100 points based in large part upon noncatastrophic automobile loss ratios. Gardner met all three of these criteria and was one of 12 agents in Alabama who were enrolled in the program.
An "Action Plan" was created to assist these agents in reducing their losses. Gardner voluntarily executed the Action Plan, which consisted of three basic requirements. First, she was required to submit all automobile-insurance applications and renewals through an assigned underwriter. Second, she was required to personally produce all applications for automobile policies, as opposed to delegating that task to a licensed staff person. Finally, Gardner was required to take two photographs of the automobiles listed to be insured and to submit the pictures to State Farm along with the application.
Gardner claimed that this Action Plan hindered her efforts to cultivate new business, but the testimony presented demonstrated that the plan produced few changes in her business practices. Gardner did not have a licensed person on her staff who was qualified to produce applications; therefore, the requirement that she personally produce applications would not have significantly impacted this aspect of her business. Gardner testified, however, that before the implementation of the Action Plan, she had expedited the production of applications by dictating the contents of the application to a clerical person who had input the information into the computer.
The requirement that Gardner be assigned to a specific underwriter would not have affected her business practices, because all State Farm agents were already assigned to a particular underwriter.
The only significant additional duty the Action Plan imposed upon Gardner was the requirement that she obtain two photographs of the vehicles to be insured and submit those photographs to the company along with the application. This additional duty did not appear to impose an undue burden on Gardner, because every State Farm agent was already required to personally inspect the vehicle that was being insured, before submitting an application for automobile coverage. Those agents enrolled in the Action Plan were required to obtain photographs during their inspection of the vehicle. The purpose of having the photographs made was to help the agents reduce their losses by avoiding claims for previous, prepolicy damage.
The testimony is disputed about how well Gardner complied with the requirements of the Action Plan. Gardner and her grown daughter, who at one time had worked for her in the agency, testified that they strictly complied with the additional requirements, but they claimed that State Farm habitually lost items, such as pictures and applications, that were mailed to it and repeatedly asked for the items to be resent. State Farm executives testified that Gardner failed to fully comply with the plan and that State Farm personnel were repeatedly forced to contact Gardner to seek additional required information in order to process applications. Because of Gardner's alleged failure to comply with the Action Plan, State Farm withdrew, for a period of 30 days, Gardner's privilege to unilaterally bind State Farm automobile insurance without prior underwriting approval. Gardner allegedly continued to fail to comply with the Action Plan, and State Farm restricted her from submitting any new business for an approximate nine-month period.
Compliance with the Action Plan was designed to effectively reduce an agent's losses. After Gardner had participated in the program for a period of 12 months, her *1205 losses had been reduced to a satisfactory level and she was removed from the High Priority Program.
In January 1997, Gardner discovered that several insurance applications were missing on insurance policies she had bound. Michael Matlock, vice president of agency for State Farm, was assigned to assist Gardner in locating these missing applications. Pursuant to the terms of the "Agent's Agreement," the applications were State Farm's property.
Robert West, regional vice president of State Farm, testified that State Farm considered it a serious matter when an application was lost. He explained that the company had a policy of allowing the agent to "bind" coverage, immediately upon receipt of the customer's premium payment, for a period of 90 days. He stated that once the coverage was "bound," the agent was responsible for immediately forwarding the application to the company. West testified that the underwriting department would review the applications once they arrived and determine whether State Farm would insure against the risk. West explained that an inordinate delay between the time when the coverage was "bound" and the time when the carrier reviewed the application to verify that it would accept the risk could be very detrimental to the company. He explained that if an application was not immediately delivered to the company, then the underwriting department was precluded from promptly evaluating the application and determining whether the risk to be insured against was within the acceptable guidelines. He stated that this delay could interfere with the company's ability to send timely cancellation notices to customers whose risk did not fall within the acceptable limits and would thereby obligate the company to provide coverage for risks that did not meet its criteria. West emphasized that because of the serious consequences that could result when an application was lost, State Farm was making every possible effort to ensure that Gardner's missing applications were located.
Matlock arrived at Gardner's office on February 3, 1997, to review Gardner's files and to search for the missing applications. Upon his arrival, he learned that Gardner had implemented a "paperless" system, by entering data from her files into a computer,[2] and had disposed of all of her files in the city landfill. Gary Hazzard, deputy regional vice president for State Farm, and West both testified that they suspected that Gardner had deliberately disposed of her files in order to "cover up" certain mistakes she had made.
West testified that, after learning that the files had been destroyed, State Farm representatives met frequently with Gardner to review applications stored at her agency. According to Gardner, the tone at these meetings was acrimonious and hostile. Gardner testified that she felt berated by the State Farm representatives at these meetings, and she ultimately refused to participate in any further meetings. Upon learning of Gardner's refusal to attend any further company meetings, State Farm notified Gardner in writing of her termination. Gardner requested a review of her termination, as contemplated by the Agent's Agreement. The Review Committee met on September 21, 1998, and unanimously recommended that Gardner's termination be upheld.
Gardner sued State Farm and three executives of State Farm who had lived in *1206 Alabama during the relevant period. In her complaint, Gardner claimed breach of contract, intentional interference with a business relationship, defamation, fraudulent misrepresentation, fraudulent suppression, conspiracy, the tort of outrage, and conversion. Gardner later amended her complaint to add 22 additional officers and directors as defendants.
On September 15, 1999, the trial court entered a summary judgment in favor of one of the State Farm executives. Thereafter, the remaining defendants moved for a summary judgment on the breach-of-contract claim; the trial court reserved its ruling on this motion. Immediately preceding the trial of the case, Gardner dismissed all of her claims for damages for mental anguish. The case was tried to a jury on March 13, 2000, After Gardner had presented her case, the remaining defendants moved for a JML on all claims. The trial court granted this motion on all claims as to all defendants, with the sole exception of the breach-of-contract claim against State Farm. At the close of the evidence, State Farm moved for a JML on Gardner's claim alleging breach of contract. The trial court denied that motion. The breach-of-contract claim was submitted to the jury and the jury returned a verdict in favor of Gardner in the amount of $186,000, and, on March 21, 2000, the trial court entered a judgment on that verdict. On March 28, 2000, State Farm renewed its motion for a JML, pursuant to Rule 50(b), Ala.R.Civ.P.
On June 20, 2000, the trial court set aside its judgment on the jury verdict and entered a JML on Gardner's breach-of-contract claim against State Farm. As grounds for its JML, the trial court stated that it had reviewed the "Agent's Agreement" Gardner had executed with State Farm and had concluded that the contract was terminable at will. In its judgment, the trial court further stated that, in accordance with Rule 50(c)(1), Ala.R.Civ.P., it conditionally granted State Farm's motion for a new trial, in the event the JML was subsequently vacated or reversed.
Gardner appealed to the supreme court. That court transferred the appeal to this court, pursuant to § 12-2-7(6), Ala.Code 1975. Gardner challenges the correctness of the trial court's judgment as a matter of law on her claim against State Farm alleging breach of contract. Gardner claims that State Farm breached its agreement with her by terminating the Agent's Agreement without just cause; by denying her request to allow Dave Jones, a retired State Farm agent, to serve as a member of her termination-review committee, and by placing certain requirements on her that were not included in the terms of the Agent's Agreement. She also argues that the trial court erred in entering a judgment as a matter of law in favor of State Farm on her claims of fraud.
Upon review of a trial court's denial of a motion for a JML, the reviewing court applies the same standard "used by the trial court ... denying the motion[ ] initially." Bussey v. John Deere Co., 531 So.2d 860, 863 (Ala.1988). Stated differently, a defendant's motion for a JML is properly denied only when the court, viewing the evidence in a light most favorable to the nonmovant, concludes that the plaintiff has presented substantial evidence to support each element of the plaintiff's claim. Glenlakes Realty Co. v. Norwood, 721 So.2d 174, 177 (Ala.1998). Gardner claims that the terms of the Agent's Agreement pertaining to the termination-review process rendered ambiguous the provision stating that the contract was terminable at will by either party.
Gardner argues in her brief to this court that "[i]n order to hold that the Agent's Agreement, on its face, clearly and *1207 unambiguously permitted State Farm to terminate an agent at will, the trial court would have also had to hold that the parties to the contract did not intend for the termination review procedure to have any meaning whatsoever." Gardner claims that she should be allowed to admit parol evidence to resolve this alleged ambiguity.
The termination provision in the Agent's Agreement provided as follows:
"This Agreement will terminate upon your death. You or State Farm have the right to terminate this Agreement by written notice delivered to the other or mailed to the other's last known address."
Whether an agreement is ambiguous is a question of law to be determined by the trial court. Gabrielson v. Healthcorp of Eufaula, Inc., 628 So.2d 411, 415 (Ala. 1993). When a written agreement is determined to be clear and unambiguous, parol evidence is not admissible to vary the terms of the agreement. Sheridan v. Board of Water & Sewer Comm'rs of the City of Prichard, 764 So.2d 526 (Ala.2000).
An identical provision was recently interpreted by the United States District Court for the Northern District of Alabama, in Ventress v. State Farm Insurance Cos. (No. CV-99-B-1925-S) (N.D.Ala., Sept. 18, 2000) (not reported in F.Supp.). In Ventress, two State Farm agents sought a judgment declaring that the agreement they had executed with State Farm permitting them to serve as State Farm agents was terminable only for cause. It is unclear from the text of the Ventress opinion whether the entire contract was identical to the one Gardner executed; it is clear, however, that the termination provision was identical. The Ventress court held:
"By its own clear terms, the [agent's contract] unambiguously provides that it may be terminated at any time by either State Farm or the agent for any reason, or no reason at all. State Farm cited the court to a number of decisions where courts have reviewed State Farm Agent's Agreements containing the precise termination language found in [the subject agreement] and have held those agreements to be terminable at-will. The court is in agreement with those courts and today joins in their conclusion that the State Farm Agent's Agreement (including the [subject agreement]), as a matter of law, are terminable at the will of either party, with or without cause."
Id., citing McDonald v. U.S. Die Casting & Dev. Co., 585 So.2d 853 (Ala.1991). At least two other jurisdictions have interpreted similar provisions and have reached the same conclusion as the Ventress court. See, Melnick v. State Farm Mut. Auto. Ins. Co., 106 N.M. 726, 749 P.2d 1105, 1110 (N.M.1988)(affirming a judgment in favor of State Farm on an agent's claim alleging breach of an implied covenant of good faith and fair dealing, the New Mexico Supreme Court made a necessary finding that a similar agency contract was clear and unambiguous); and Mooney v. State Farm Ins. Co., 344 F.Supp. 697, 699 (D.N.H. 1972)(court entered a summary judgment in favor of State Farm on breach-of-contract claim, holding that the provision in a similar contract allowing for a termination-review hearing did not "change the termination clause [or] render that clause ambiguous").
Alabama has a well-established "employment-at-will" doctrine, under which an employer may terminate an employee at its discretion, if no provision in the employment contract provides for a specific term of employment or sets forth terms and conditions for dismissal. Burks v. Pickwick Hotel, 607 So.2d 187 (Ala. 1992). Our supreme court, addressing *1208 facts similar to those in the present case, has determined similar insurance agency contracts to be terminable at will. See Salter v. Alfa Ins. Co., 561 So.2d 1050 (Ala.1990); and Bosarge v. Bankers Life Co., 541 So.2d 499 (Ala.1989).
In the alternative, Gardner argues that even if the language of the Agent's Agreement is considered clear and unambiguous on its face, parol evidence should have been admitted at trial to resolve what she calls a latent ambiguity. Gardner cites Interstate Inv. Corp. v. Rose Care, Inc., 631 So.2d 836 (Ala.1993), in support of this argument. The Rose Care court stated, "A latent ambiguity occurs when the language of an instrument is clear and intelligible, but, when considered in light of certain extraneous facts, takes on another meaning." Id. at 839. Gardner argues that State Farm's elaborate termination-review procedure was inconsistent with the termination-at-will provision and thus made that provision of the Agent's Agreement ambiguous. A similar argument was advanced in Burrell v. Carraway Methodist Hosps. of Alabama, Inc., 607 So.2d 193 (Ala.1992). In Burrell, a discharged employee claimed that his employer had "represented by its practice" that he could be terminated only for cause. 607 So.2d at 195. Rejecting this claim, our supreme court held that when an employer institutes a general procedure designed to eliminate arbitrary terminations, this conduct does not divest it of its status as an "at will" employer. Burrell, 607 So.2d at 195. Following the rationale set forth in Burrell, we conclude that the termination-review procedure provided for in the Agent's Agreement was not inconsistent with the provision stating that the agreement was terminable at will.
Gardner contends that the terms of the Agent's Agreement were altered by statements she says were made to her at the time she executed the agreement she says she was told that she would be terminated only if she cheated or misappropriated company funds. Because we have already concluded that the terms of the Agent's Agreement were clear and unambiguous under Alabama law, the terms of that agreement may not be altered by parol evidence. Sheridan, 764 So.2d at 528. Further, the Agent's Agreement contained the following "merger clause":
"This agreement shall supersede all prior agreements between the several parties hereto, whether written or otherwise, provided that the provisions in prior agreements establishing the amount and method of repayment by the Agent to the Companies for financing deficits incurred under prior agreements shall remain in force until such deficits are repaid in full."
A "merger" or "integration" clause such as this one is used to ensure that all preliminary negotiations, whether oral or written, are merged into the final executed agreement. Infiniti of Mobile, Inc. v. Office, 727 So.2d 42, 46 (Ala.1999). These agreements are enforceable in Alabama. Id. Because we consider the Agent's Agreement to be clear and unambiguous, and thus that its terms are not subject to being altered by parol evidence, and because of the effect of the merger clause, we are not persuaded by Gardner's claims that the agreement was altered by any statements that may have been made to her at the time she executed the agreement.
Gardner also claims that the trial court erred in excluding the testimony of a former State Farm agent who would have testified about statements made to him when he signed his contract. We have already held in this matter that when a contract is unambiguous, parol evidence is not admissible to vary the terms *1209 of the contract. Sheridan, 764 So.2d at 528. Further, a trial court has wide discretion in determining whether evidence is relevant and probative. Sweeney v. Purvis, 665 So.2d 926 (Ala.1995). We cannot say the trial court erred in excluding the testimony of the former State Farm agent.
Gardner also argues that State Farm breached its Agent's Agreement by the manner in which it administered its termination procedure and in allegedly violating her status as an independent contractor by enrolling her in the High Priority Program. She cites no authority in her appeal brief in support of these arguments. Rule 28(a)(5), Ala.R.App.P., provides that "[t]he argument[s] shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on." See also McLemore v. Fleming, 604 So.2d 353 (Ala.1992). Because Gardner's arguments on these issues do not comply with the requirements of Rule 28, Ala.R.App.P., we decline to address these contentions.
Gardner further claims the trial court erred in entering the JML on her claim alleging fraudulent misrepresentation. She claims that she was told by a State Farm representative that the Agent's Agreement would be terminated only for theft, that that statement was false, and that she had suffered damage as a result of the fraudulent misrepresentation. In essence, it appears that Gardner's claim is one of promissory fraud. "In order to establish promissory fraud, a plaintiff must show: (1) a false representation; (2) of an existing material fact; (3) that is [reasonably][3] relied upon; (4) damage resulting as a proximate cause, and that, (5) at the time of the misrepresentation, the defendant had the intention not to perform the promised act and (6) that the defendant had an intent to deceive." Pinyan v. Community Bank, 644 So.2d 919, 923 (Ala.1994).
In Foremost Insurance Co. v. Parham, 693 So.2d 409 (Ala.1997), which governs the present case, our supreme court held that the return to the "reasonable-reliance" standard in fraud cases (see note 3):
"provide[s] a mechanism ... whereby the trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms."
693 So.2d at 421. Because the Agent's Agreement clearly provided that it was terminable at will and because it contained a merger clause superseding any prior written or oral agreements and providing that it could be amended only in writing, we conclude that Gardner could not have reasonably relied upon any agent's alleged statement telling her that she could be terminated only for theft.
In addition, Gardner's claim alleging promissory fraud must also fail, because she presented no evidence tending to show that State Farm representatives, at the time they allegedly made the statement telling her she would not be terminated except for theft, intended to deceive her. A present intent to deceive is an essential element of promissory fraud. Pinyan, 644 So.2d at 923. The trial court properly entered the JML on Gardner's claim alleging promissory fraud. See Sevier *1210 Ins. Agency, Inc. v. Willis Corroon Corp. of Birmingham, 711 So.2d 995 (Ala. 1998).
Finally, Gardner argues that the trial court erred in conditionally granting State Farm's motion for a new trial in the event this court reverses the JML in favor of State Farm. This issue is moot because we have affirmed the trial court's JML in favor of State Farm. See Semo Aviation, Inc. v. Southeastern Airways Corp., 360 So.2d 936 (Ala.1978).
The judgment of the trial court is affirmed.
AFFIRMED.
PITTMAN and MURDOCK, JJ., concur.
YATES, P.J., and CRAWLEY, J., dissent.
CRAWLEY, Judge, dissenting.
I respectfully dissent, because I think the terms of Gardner's "Agent's Agreement" with State Farm are ambiguous. One part of the agreement states that it is terminable at will by either party upon written notice. Another part of the agreement provides for a termination-review process whereby the agent can initiate an inquiry into the reasons for his or her dismissal. I think the two provisions are so antithetical (and that the contract, therefore, is so ambiguous) that parol evidence should be admissible to explain their meaning.
The authorities cited in support of the majority's holding that the agreement is not ambiguous are neither persuasive nor controlling. The first, Ventress v. State Farm Insurance Cos. (No. CV-99B-1925-S) (N.D.Ala., Sept. 18, 2000) (not reported in F.Supp.), quotes from and relies wholly upon another federal case, Mooney v. State Farm Insurance Cos., 344 F.Supp. 697 (D.N.H.1972), for the following proposition:
"The review hearing provision does not change the termination clause, nor does it render that clause ambiguous. Its purpose is to benefit [State Farm] by providing review of lower management decisions to terminate and reversal where those decisions were based on poor judgment."
Mooney, 344 F.Supp. at 699-700. I do not find Mooney persuasive, for two reasons. First, the decision cites no authority in support of its holding that the agent's agreement is unambiguous. Second, although the court was ruling on a motion for a summary judgment (a motion due to be granted only when there are no disputed issues of fact), the court actually resolved a crucial factual disputethe purpose of the termination-review procedure when it stated that the procedure was "to benefit [State Farm] by providing review of lower management decisions to terminate and reversal where those decisions were based on poor judgment." Id.
The majority of this court also cites a New Mexico case, Melnick v. State Farm Mutual Automobile Insurance Co., 106 N.M. 726, 749 P.2d 1105 (N.M.), cert. denied, 488 U.S. 822, 109 S.Ct. 67, 102 L.Ed.2d 44 (1988), in support of its decision that there is no ambiguity in the Agent's Agreement. Melnick, however, does not even address the issue of ambiguity. It focuses solely on the issue whether State Farm breached an implied covenant of good faith and fair dealing when it terminated the agent.
The decisions in Ventress, Mooney, and Melnick are not binding on this court. Moreover, they either are not well reasoned *1211 or do not stand for the propositions stated.
NOTES
[1] This program was designed to identify agents experiencing problems with excessive losses and to teach these agents organizational skills designed to help them to reduce those losses.
[2] Gardner admitted in her testimony that she had failed to enter many important items of information from these files into the computer data system before she disposed of the files; she said the failure was inadvertent.
[3] Because this action was filed after March 14, 1997, the "reasonable-reliance" standard, rather than the "justifiable-reliance" standard, applies to this action. Foremost Ins. Co. v. Parham, 693 So.2d 409, 421 (Ala.1997).