JAMES H. WASHINGTON INSURANCE AGENCY, Appellant,

v.

NATIONWIDE MUTUAL INSURANCE CO., Appellee.

[Cite as *James H. Washington Ins. Agency v. Nationwide Mut. Ins. Co.* (1993), 95 Ohio App.3d 577.]

Court of Appeals of Ohio,
Cuyahoga County.

Nos. 62347, 62392.

Decided April 8, 1993.

*Nurenburg, Plevin, Heller & McCarthy Co., L.P.A., Thomas Mester* and *James T. Schumacher,* for appellant.

*Arter & Hadden, John T. Doheny* and *Jean Kerr Korman,* for appellee.

PORTER, Judge.

Plaintiff-appellant, James H. Washington Insurance Agency, appeals from the partial summary judgment (on five counts) and directed verdict (on four counts) in favor of defendant-appellee, Nationwide Mutual Insurance Company ("Nationwide"), entered in the common pleas court below.

The issues in this case arise out of the interpretation of Washington's exclusive Agent's Agreement ("Agreement") with Nationwide, effective January 1, 1987; Letters of Authority; and Nationwide's Agent Brokerage Policy. Specifically, the appeal involves Nationwide's right to cancel the Agreement any time, with or without cause, following written notice to Washington, and Nationwide's right to cancel deferred compensation and incentive credits ("DCIC") and extended earnings for breach of a noncompetition condition after Washington's termination. The termination occurred after Washington refused to cancel two licenses for other insurance companies, contrary to the exclusivity provision of his Agent's Agreement with Nationwide.

Washington also claimed he was owed commissions on the Cleveland School Board and Garfield Heights Board of Education insurance business in 1985 and 1986, and was forced to accept high-risk fire insurance policies in 1979 to his detriment. For the reasons stated below, we affirm the lower court's decisions.

Washington had been an independent agent with Nationwide since 1971. The January 1, 1987 Agent's Agreement provided that "[t]his Agreement shall be in force until cancelled *by either party.*" Paragraph 9 of the Agent's Agreement. The cancellation clause continued:

"Further, due to the personal nature of our relationship you or the Companies [Nationwide] have the right to cancel this Agreement at any time after written notice has been delivered to the other or mailed to the other's last known address."

There was no requirement that either Nationwide or Washington could cancel the Agent's Agreement only for good cause.

Nationwide also required its agents to represent Nationwide exclusively, *i.e.,* not to "solicit or write policies of insurance in [other] companies * * * either directly or indirectly without the written consent of [Nationwide]." Paragraph 4 of the Agent's Agreement. In 1989, Nationwide discovered that Washington had obtained licenses with Blue Cross & Blue Shield ("BC & BS") and Medical Life Insurance Company ("Medical Life"). On January 4, 1990, Nationwide sent a letter to Washington advising him that his two licenses with BC & BS and Medical Life violated the terms of his Agent's Agreement. Failure to cancel those licenses in thirty days, Nationwide wrote, would give Nationwide no alternative but to terminate his contract. Washington failed to cancel the licenses. On May 24, 1990, Nationwide sent Washington written notice that his Agent's Agreement with Nationwide was canceled.

The exclusive representation clause states in pertinent part:

"It is agreed and understood that you will represent us *exclusively in the sale and service of insurance.* Such exclusive representation shall mean that *you will not solicit or write policies of insurance in companies other than those parties to this agreement,* either directly or indirectly, *without the written consent of these companies * * *.*" (Emphasis added.) Paragraph 9 of the Agent's Agreement.

However, Washington claims he had obtained written consent from Nationwide to be licensed with BC & BS and Medical Life, when he obtained signed Letters of Authority in 1981 and 1988. Thus, Washington argues that he did not violate the exclusivity feature of the Agreement and was not competing with Nationwide directly or indirectly within a twenty-five-mile radius of his Nationwide location during the first year following termination.

Nationwide does not dispute that the Letters of Authority gave Washington permission to broker, through other agents or brokers, business Nationwide would not write. Nor does Nationwide contend that Washington could not accept commissions through these other agents. However, contrary to Washington's assertions, Nationwide argues that the Letters of Authority, which are governed

by Nationwide's Agent Brokerage Policy, reinforce Nationwide's policy of exclusive representation and expressly prohibit Nationwide agents from being licensed with other companies.

Paragraph A of Nationwide's Agent Brokerage Policy is entitled "DIRECTION—EXCLUSIVE NATIONWIDE AGENT," and provides:

"The continuing and long-range intent is for the Nationwide agent to be an exclusive representative supported by the key products necessary to serve our policyholders and to significantly penetrate Nationwide markets for market share growth."

Paragraph B, entitled "CONTRACT," quotes verbatim the exclusive representation clauses set forth in paragraph 4 of the Agent's Agreement and concludes that "all violations of the Agent's Agreement or Letter of Authority are a breach of contract."

Paragraph C, entitled "BROKERAGE POLICY," defines the scope of an agent's authority to place coverage outside Nationwide. It permits the placement of business only "through other agents or brokers." There is no authorization to obtain a license with another company.

"Career agents will be given written authority upon request to place through other agents or brokers that business which is unacceptable to, declined by, or canceled by the company."

Nationwide contends that paragraphs A, B and C, construed as a whole together with paragraph 4 of the Agent's Agreement, clearly express the policy and intent that Nationwide agents who have obtained a Letter of Authority may place through other agents or brokers business Nationwide will not write, but these agents must remain exclusive Nationwide agents. To resolve any possible ambiguity Nationwide points to paragraph D, "PROHIBITED PRACTICES," of the Brokerage Policy, which states that Nationwide's Agents will be prohibited from:

"1. Being licensed with another company unless required by law *and* with written approval." (Emphasis added.)

Washington argues he comes within the exception because (1) he was required by law to be licensed to accept commissions from BC & BS and Medical Life, and (2) his Letters of Authority constitute Nationwide's written approval. Nationwide contends that the exception does not apply and that Washington misconstrues the regulations governing the licensure of insurance agents in Ohio. Pursuant to Ohio Adm.Code 3901–1–10(H)(1), an agent must be licensed with an insurer to receive direct payment and one hundred percent of his commissions. However, the very next section, Ohio Adm.Code 3901–1–1–(H)(2),[1] permits a

---

1. Ohio Adm.Code 3901–1–10(H)(2) states in pertinent part:

licensed agent to split commissions with agents duly licensed with other companies. Thus, according to Nationwide, Washington was not required by law to be licensed to accept commissions from BC & BS and Medical Life. Nationwide claims Washington became licensed with BC & BS and Medical Life in 1983 and 1987 to write directly for those carriers in order to maximize his commissions and to prevent splitting his commissions with a licensed BC & BS or Medical Life agent. Washington testified that he earned $200,000 in 1989–1990 and projected earnings of $400,000 for 1990–1991, from renewal commissions on Washington's BC & BS and Medical Life business.

It is undisputed that Washington was licensed with other companies on the date of Nationwide's May 24, 1990 termination, and continued to be licensed with, and receive commissions from, BC & BS and Medical Life for the year following termination. Washington was licensed to sell health insurance for Nationwide and sold health insurance for Nationwide prior to his termination. Furthermore, Nationwide also contends that, contrary to the Agent's Agreement, Washington did not return Nationwide's computer equipment, manuals and other supplies until February 1991.

Nationwide claims Washington forfeited his right to continued DCIC and extended earnings because his conduct following termination explicitly violated paragraphs 11(f)(1) and (2) of the Agent's Agreement, which state:

"f. *Cessation of Agency Security Compensation.*

"All liability of the Companies for Agent Security Compensation provided for in paragraph 11 and its subparagraphs shall cease and terminate in the event any one or more of the following shall occur:

"(1) You either directly or indirectly * * * engage in or be licensed as an agent, solicitor, representative, or broker or in anyway be connected with the fire, casualty, health, or life insurance business within one year following cancellation within a 25–mile radius of your business location at that time; or

"(2) You fail to return in good condition, within ten days, all materials, records and supplies furnished to you by the Companies during the course of this Agreement * * *."

---

"Payment of commissions by licensed agents of insurance companies other than life: Pursuant to §§ 3905.01 and 5729.07 of the Revised Code, only a licensed agent of an insurance company authorized to do business in this state may procure the insurance of risks * * * in other like companies authorized to do business in this state through a licensed agent of such company taking the risk and may receive the payment of any commission, consideration, money, or other thing of value only from said licensed agent of such company taking the risk."

Nationwide's May 24, 1990 termination letter warned Washington that these terms would be enforced and directed him to return Nationwide's property to the Agency Manager. Washington testified that he was familiar with these conditions, which were also described in Nationwide's cash manual. Despite the letter notice, Washington did not cancel his licenses with BC & BS and Medical Life by June 3, 1990 and did not return Nationwide's equipment as requested. Thus, Nationwide claims Washington forfeited his right to continued DCIC and extended earnings under the terms of paragraphs 11(f)(1) and (2).

Washington claims Nationwide was estopped from cancelling Washington's DCIC and extended earnings because Nationwide issued one check to Washington on June 29, 1990 for DCIC and extended earnings. Nationwide explained this was a safeguard in order that terminated agents who are following the company rules are not penalized. But if Nationwide determines the agent has committed one or more of the prohibited acts set forth in paragraph 11(f), then future payments are discontinued. Nationwide's benefits department learned on July 13, 1990 that Washington was in violation of paragraph 11(f)(2) of the Agent's Agreement because he had failed to return Nationwide's equipment and other materials ten days following cancellation of the Agent's Agreement. For that reason and breach of the noncompetition condition, Nationwide claims Washington was not entitled to any further payments.

Nationwide also claimed that Washington was not entitled to commissions on the Cleveland School Board and Garfield Heights School Board business. The general rule regarding compensation of agents was set forth in the Agent's Agreement:

"*Compensation.* It is agreed that we will pay you any and all original and renewal commissions earned by you * * * on business written by you while employed by us under our Agent's Employment Agreement." Paragraph 7 of the Agent's Agreement.

Nationwide's standard policy was to award in-force renewal commissions to the agent who is currently and satisfactorily servicing the account. Special company policies with respect to school districts provide that the first two agents to apply for bids for a school contract are awarded the bids and the remaining agents do not receive a bid, but that if a customer wants a certain agent to service their account, the customer can write an official letter or "Agent or Record" letter and ask for a specific agent.

Washington also claimed Nationwide forced him to accept high-risk fire insurance policies in 1979, which allegedly led to high losses and a two-year moratorium on Washington's fire insurance license. The trial court determined that there was insufficient evidence to support this claim and that Washington's damages were speculative and removed this issue from consideration by the jury.

### Standard of Review on Summary Judgment

It is axiomatic that a motion for summary judgment shall only be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). Summary judgment shall not be granted unless it appears from the evidence that reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion is made. In reviewing a motion for summary judgment, the inferences to be drawn from the underlying facts must be reviewed in the light most favorable to the party opposing the motion. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 471–472, 364 N.E.2d 267, 273.

Moreover, upon motion for summary judgment pursuant to Civ.R. 56, the burden of establishing that material facts are not in dispute and that no genuine issue of fact exists is on the party moving for summary judgment. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 74, 375 N.E.2d 46, 47–48. However, in that Civ.R. 56(E) requires that a party set forth specific facts showing that there is a genuine issue for trial, such party must so perform if he is to avoid summary judgment. *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph seven of the syllabus. In other words, the motion for summary judgment "forces the non-moving party to produce evidence on any issue for which that party bears the burden of production at trial." *Wing v. Anchor Media, Ltd. of Texas* (1991) 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus. However, bare allegations stated in conclusory fashion in an affidavit are insufficient standing alone to create genuine issues of fact. *Stibora v. Greater Cleveland Bowling Assn.* (1989), 63 Ohio App.3d 107, 113, 577 N.E.2d 1175, 1178–1179.

With these standards in mind, this court is obliged to look at the record *de novo* to determine whether as a matter of law defendant was entitled to summary judgment below, dismissing Counts I through IV of the amended complaint. We shall address the defendant's assignments of error in the order in which they were asserted:

"I. The trial court erred in granting Nationwide's motion for summary judgment where genuine issues of fact existed to demonstrate that Nationwide wrongfully terminated Washington's agency agreement and withheld commissions it owed to Washington."

Washington argues that (1) Nationwide was required to prove that Washington breached the Agent's Agreement in order for Nationwide to lawfully terminate him; and (2) alternatively, that the Letters of Authority and Brokerage Policy permitted him to be licensed with other companies, thereby presenting a genuine issue of fact as to wrongful termination.

A review of Washington's Agent's Agreement, Letters of Authority and Nation-wide's Brokerage Policy demonstrates that the trial court committed no error in granting summary judgment on Count I of the amended complaint. The Agent's Agreement provided it could be cancelled "at any time after written notice has been delivered to the other * * *." Washington signed the Agent's Agreement and understood it required him to be an exclusive representative for Nationwide. This court has previously construed the identical language set forth in paragraph 9 of Washington's Agent's Agreement and determined its meaning is clear and unambiguous—either party can terminate the Agreement by giving written notice. Summary judgment was approved in those cases. *Brodzinkski v. Nationwide Mut. Ins. Co.* (Aug. 18, 1977), Cuyahoga App. No. 36055, unreported; *Kezdi v. Nationwide Ins. Co.* (Aug. 11, 1977), Cuyahoga App. No. 35683, unreported; see, also, *Forcina v. State Auto Ins. Co.* (Sept. 21, 1989), Cuyahoga App. No. 55731, unreported, 1989 WL 112406, to the same effect.

It is undisputed Washington received written notice of his termination on May 24, 1990. Accordingly, under our earlier precedents, there is no issue of fact as to whether Washington was wrongfully terminated, since either party could cancel with or without cause on written notice. That was done here. We must affirm the trial court's summary judgment on Count I of the amended complaint.

■ Insofar as Washington claims commissions for the Cleveland School Board business, we must again defer to the Agent's Agreement. Nationwide agreed to pay Washington "any and all original and renewal commissions earned by you, * * * on business written by you while employed by us under our Agent's Employment Agreement." Paragraph 7 of the Agent's Agreement.

Washington argues that the October 30, 1985 "Agent of Record" letter from Harrison Dillard, business manager for the Cleveland schools, mandated that Nationwide pay Washington the one-month commission generated from this account in February 1986. However, Nationwide's evidence disclosed that Gregory Yasher was the first Nationwide agent to write business acceptable to the Cleveland schools and he obtained the business in 1984, effective February 1, 1985.

Moreover, it is undisputed that Washington did not "write the business" for the Cleveland schools. Under the terms of his Agent's Agreement, he is not entitled to the commission, notwithstanding the Harrison Dillard letter of October 30, 1985. Because Nationwide's standard policy was to award in-force renewal commissions to the agent currently and satisfactorily servicing the account (Yasher), Nationwide did not honor Dillard's request. Because it appeared that Dillard's letter was not authorized by the school board, Nationwide requested that the board confirm its desire to name Washington as its exclusive agent. The

board's insurance manager confirmed that Yasher had been the school district's agent for the past year and that a renewal quotation should be issued to him.

Washington's affidavit in opposition to the foregoing facts simply stated the conclusory allegation that the statements in Nationwide's affidavit "speak for themselves in light of documentation provided by the defendant and plaintiff." This was not sufficient to prevent summary judgment. When the nonmoving party fails to respond with *specific facts,* the affidavits of the moving party are accepted as true. *Stemen v. Shibley* (1982), 11 Ohio App.3d 263, 268, 11 OBR 441, 447–448, 465 N.E.2d 460, 466–467. Based on the evidence before it, the trial court properly determined there was no genuine issue of fact and that Washington was not owed commissions on the Cleveland School Board business. We affirm summary judgment on Counts II through V of the amended complaint.

This assignment of error is overruled.

"II. The trial court erred in granting Nationwide's motion for directed verdict where the evidence was sufficient for reasonable minds to believe that Nationwide withheld monies it owed to Washington."

After the summary judgment rulings, the case proceeded to jury trial on the remaining Counts VI to IX of the amended complaint, involving the disputed Garfield Heights commissions and post-termination payments of DCIC and extended earnings under paragraphs 11(f)(1) and (2) of the Agent's Agreement. We find no error in the trial court's granting of a directed verdict at the close of plaintiff's case.

The inquiry to be made by the trial court in ruling on a motion for a directed verdict during trial is equated with that used for summary judgment before trial: whether there is but one reasonable conclusion as to the verdict when the evidence is construed most strongly in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 251–252, 106 S.Ct. 2505, 2511–2512, 91 L.Ed.2d 202, 213–214; *Paul v. Uniroyal Plastics Co.* (1988), 62 Ohio App.3d 277, 281, 575 N.E.2d 484, 486–487; *Hinkle v. Cornwell Quality Tool Co.* (1987), 40 Ohio App.3d 162, 165, 532 N.E.2d 772, 775–776. Plaintiff must present substantial competent evidence in support of his case upon which reasonable minds might reach different conclusions in order for a directed verdict to be denied. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284, 21 O.O.3d 177, 178–179, 423 N.E.2d 467, 469.

Regarding the Garfield Heights commissions, Washington argues that disputed issues of fact were created by Nationwide's award of commissions to Robert Butler, who allegedly did no work to obtain the business but presented a valid "Agent of Record" Letter. Washington argues that Nationwide can't have it both ways, *i.e.,* Washington's October 30, 1985 "Agent of Record" letter did not

entitle him to commissions on the Cleveland School Board business, but by the same token, Butler nevertheless got the Garfield Heights commissions solely because he had an "Agent of Record" letter.

Washington and another Nationwide agent, Saul Obelenis, both submitted the first two requests for the Garfield Heights School Board quotes. According to Nationwide's policy, these were the only agents initially issued bids. However, neither agent received the contract. Rather, Butler was awarded the contract and commissions because Nationwide received an official letter from the Garfield Heights School Board Treasurer, informing Nationwide that the board members had appointed Butler as the agent they wanted servicing their account. Nationwide made the business judgment to honor Butler's "Agent of Record" Letter because it was clear on its face that it was authorized by the Garfield Heights School Board. In addition, although Washington and Obelenis had submitted bids, neither agent was currently servicing the Garfield Heights' account. The trial court concluded there was no evidence that Nationwide violated its own policy, or any other rule or regulation, in complying with the request made by the Garfield Heights School Board that the business be given to Butler. Accordingly, a directed verdict on Count VI of the amended complaint was proper and is affirmed.

Washington testified he received high-risk fire insurance policies in 1979 from Nationwide's agency manager. These policies were not introduced into evidence and there was no testimony from the manager. Washington testified that these policies sustained substantial losses resulting in a two-year moratorium on his ability to sell fire insurance policies. No proof was provided of the claimed losses and no documents or other competent evidence was introduced showing that there was indeed a two-year prohibition on Washington selling fire insurance. When asked on direct examination what his losses were, Washington responded, "I don't know. Quite a bit. I couldn't write policies." Washington then claimed in the prior year, he earned $15,000 in commissions based on $400,000 in premiums on fire insurance. Washington then testified he lost $30,000 in commissions during his two-year moratorium. No other evidence was presented.

The trial court found this evidence inadequate to establish causation or damages. "The general rule for the recovery of compensatory damages is that injury and the resulting damage must be shown with certainty and not be left to conjecture and speculation." *Pietz v. Toledo Trust Co.* (1989), 63 Ohio App.3d 17, 22, 577 N.E.2d 1118, 1122.

■ Further, Washington argues to this court that his evidence creates a genuine issue of fact whether Nationwide acted in bad faith. However, there is no claim for breach of an implied covenant of good faith and fair dealing in the termination of at-will employment in Ohio. *Fawcett v. G.C. Murphy & Co.* (1976),

46 Ohio St.2d 245, 250, 75 O.O.2d 291, 294, 348 N.E.2d 144, 147–148; *Anderson v. Minter* (1972), 32 Ohio St.2d 207, 213, 61 O.O.2d 447, 450, 291 N.E.2d 457, 461; *Brandenburger v. Hilti, Inc.*, (1989), 52 Ohio App.3d 21, 24, 556 N.E.2d 212, 216. See, also, *Brodzinski v. Nationwide Mut. Ins. Co.*, (Aug. 18, 1977), Cuyahoga App. No. 36055, unreported (allegations of bad faith cannot invalidate the effects of the contract which he voluntarily entered into); *Forcina v. State Auto Ins. Co.* (Sept. 21, 1989), Cuyahoga App. No. 55731, unreported, 1989 WL 112406.

We find that the trial court properly determined Ohio law does not recognize an implied covenant of good faith and fair dealing in the termination of an at-will agreement. Furthermore, Washington's testimony was insufficient without the policies, or Washington's books and records concerning these policies, or any other testimony connecting Washington's alleged damages resulting from servicing the 1979 policies. We affirm the directed verdict on Count VII of the amended complaint.

■ The remaining issues are whether Washington was entitled to go to the jury on his claim for DCIC compensation and extended earnings. His right to receive those post-termination payments is determined by the terms of his Agent's Agreement. *Brodzinski v. Nationwide Mut. Ins. Co.* (Aug. 18, 1988), Cuyahoga App. No. 36055, unreported; *White v. Bur. of Natl. Salesmen's Assn.* (Nov. 15, 1979), Cuyahoga App. No. 40121, unreported. Extended earnings would provide Washington with an amount equal to renewal commissions earned in the last twelve months of service following termination. Under DCIC, after Washington's fifth year of service, Washington received credit annually for a percentage of earnings on renewals and new policies, on certain types of insurance. Paragraph 11 of the Agent's Agreement.

In addition to a "qualified cancellation," Washington's Agent's Agreement sets forth three conditions an agent must not violate in order to be eligible to continue to receive DCIC and extended earnings payments. "All liability of [Nationwide] for Agency Security Compensation provided for in paragraph eleven and its subparagraphs shall cease and terminate in the event any one or more of the following shall occur" (paragraph 11f):

"(1) You either directly or indirectly * * * engage in or be licensed as an agent, solicitor, representative, or broker or in any way be connected with the fire, casualty, health, or life insurance business, within one year following cancellation within a 25–mile radius of your business location at that time; or

"(2) You fail to return in good condition, within ten days, all materials, records and supplies furnished to you by the Companies during the course of this Agreement * * *."

Washington admitted at trial that his office address remained 2000 Lee Road, Cleveland Heights, Ohio, as it was when he was Nationwide's agent. While working from that office during the one year following his termination, Washington was licensed as an agent or broker for two health insurance companies who were paying Washington renewal commissions—BC & BC and Medical Life.

The fact that Washington was not writing new policies is irrelevant. He was a licensed agent or broker for BC & BS and Mutual Life and collected renewal commissions from these health insurance companies at that office. Paragraph 11(f)(1) expressly prohibits an agent from being "licensed as an agent" with another health insurance business "within one year following cancellation within a 25–mile radius of your business location at that time." It is also undisputed that Washington failed to return Nationwide's computer equipment, books and records within ten days following Washington's termination.

Washington argues that paragraph 11(f)(1) is an unreasonable covenant not to compete and should not be enforced by this court. In the alternative, Washington argues he has "substantially" complied with paragraph 11(f) because "on several occasions * * * [he] encouraged policyholders to continue their business with Nationwide"; thus, he was not in direct competition with Nationwide.

This court has previously reviewed in other Nationwide cases the reasonableness of the noncompetition clause set forth in paragraph 11(f)(1) of the identical Agent's Agreement and determined Nationwide's policy of preventing an agent from working for or representing another insurance company, following termination for one year and within twenty-five miles is valid and enforceable. *Brodzinski v. Nationwide Mut. Ins. Co.*, and *Kezdi, supra*. Specifically, this court determined Nationwide's prohibition against employment with other insurance companies protected legitimate business interests. *Kezdi* at 6. In addition, the "time and territory" restriction of one year and twenty-five miles was a reasonable restriction to protect Nationwide's interest. *Brodzinski* at 4. Last, the restriction imposed no undue hardships on an agent because the agent is free to work for another company outside the restricted area and receive renewal commissions, or work for another company within the restricted territory and forfeit renewal commissions. *Kezdi* at 6. The noncompetition provisions are not unreasonable or in illegal restraint of trade because Washington is not barred from practicing his profession. Rather, he is being denied a reward that is intended only for agents who are loyal to Nationwide. *Kezdi* at 6–7. Nationwide's conditions for cancelling DCIC and extended earnings have also been upheld by the Sixth Circuit Court of Appeals. *Wolcott v. Nationwide Mut. Ins. Co.* (C.A.6, 1989), 884 F.2d 245; (with regard to 11[f], the forfeiture provision of the Agent's Agreement, it is undisputed that Wolcott violated subsections [1] and [3] ). *Plazzo v. Nationwide Mut. Ins. Co.* (C.A.6, 1989), 892 F.2d 79.

This court's holdings in *Brodzinski* and *Kezdi* are consistent with the Ohio Supreme Court's recent rulings on the enforcement of covenants not to compete. *Raimonde v. Van Vlerah* (1975), 42 Ohio St.2d 21, 71 O.O.2d 12, 325 N.E.2d 544; *Rogers v. Runfola & Assoc. Inc.* (1991), 57 Ohio St.3d 5, 565 N.E.2d 540. In *Rogers*, two court reporters signed noncompetition agreements with their employer that prevented them, after termination, from being employed as court reporters for two years within the limits of Franklin County, Ohio. *Rogers*, 57 Ohio St.3d at 5, 565 N.E.2d at 541, fn. 1. The court balanced the legitimate business interest of the employer against the employees' projected hardships and modified the time and space restraints to one year within the city limits of Columbus, Ohio. The court expressly enforced the prohibition against the employees' "engaging in court reporting or public stenography as a business, as employees, or otherwise." *Id.* at 9, 565 N.E.2d at 544.

Similarly, Nationwide's noncompetition clause prohibits Washington only from engaging in the insurance business for one year within a twenty-five-mile radius of Cleveland Heights. Moreover, the prohibition is not an absolute ban on employment. It is merely a condition to continued receipt of DCIC and extended earnings. According to the standards enunciated in *Raimonde* and *Rogers* and adopted by this court in *Brozinski* and *Kezdi*, the noncompetition provision of Washington's Agent's Agreement must be enforced.

It is undisputed that Washington violated paragraph 11(f)(1) when he was licensed with other health insurance companies through, at least, May 24, 1991 within the restricted area. It is also undisputed that Washington violated paragraph 11(f)(2) when he waited until February 1991 to return Nationwide's equipment and materials. Nationwide enforced the clear and unambiguous terms of paragraph 11(f) and properly discontinued Washington's DCIC and extended earnings. We affirm the trial court's directed verdict on Count IX of the amended complaint.

This assignment of error respecting the directed verdict rulings is overruled.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

DYKE, C.J., and JOHN F. CORRIGAN, J., concur.